1823.

Roberts
vs
Gibson

APPEAL DISMISSED.

---

JUNE.

## ROBERTS vs. GIBSON's Ex'r. et al.

The property qualification required by the 42d article of the constitution of this state, was not intended as a fund to secure the sheriff's official creditors in addition to the bond required of him as sheriff

Other clauses of the constitution may be resorted to in aid of the construction of that which may be doubtful or uncertain.

Where the same language is used in different clauses of the constitution, upon the same or similar subjects, it must receive the same construction, unless some particular reason to the contrary can be assigned.

A, in order to make B eligible as sheriff, in case he should be elected, conveyed to him certain lands, with an agreement that they should be reconveyed, &c B was not elected, but was returned, as having the next highest number of votes to C, who

APPEAL from chancery. The bill in this case was filed on the 6th of September 1804, in the name of Jacob Gibson, William M. Catrop, Nathan Harrington, and Benjamin Willmott, against the devisee and executor of Edward Roberts. On the death of Gibson, his executor was made one of the complainants. The facts were these: John Thomas was a candidate for the office of sheriff of Talbot county, at the election held on the first Monday of October 1797. On the 28th of September 1797, preceding the election, Edward Roberts, (the father of the appellant,) and his wife, conveyed to John Thomas, a tract of land called Farmer's Delight, with a view and intention, as acknowledged by Roberts, the grantor, to qualify Thomas, according to the 42d article of the constitution of this state, to hold said office, in case he should be elected. Thomas failed in the election, and Edward Cox, having the greatest number of votes, was elected and commissioned as sheriff; but Thomas was returned as having the next highest poll to that of Cox. On the 29th of November 1797, Thomas reconveyed the land to Roberts, in consideration of £1000, (as stated in the deed, and in the answer of the defendant,) the possession of the land having been always

was commissioned sheriff. B reconveyed the lands to A, and C dying within the time for which he was elected, B was commissioned as sheriff, according to the constitution, for the residue of the term, and gave bond, and having become a defaulter, his sureties in his bond became answerable, and paid considerable sums of money for him, and filed a bill against A, alleging that the deeds between A and B were a fraud upon the law, and that the sureties, as creditors of B, had a right to have the land sold for the payment of their debt—Held, that although the transaction between A and B may be considered a fraud upon the law, it did not necessarily follow that every subsequent creditor of B could take advantage of it, that if B had refused to reconvey the land to A, the law never would have lent its aid to A, who was particeps criminis, to obtain its restoration; nor would it enforce the performance of a contract made in violation of its policy. But if a third person, a subsequent creditor, attempts to vacate the deed of reconveyance on account of fraud against the public, he must show either that it was fraudulent against creditors generally under the statute of 13 Eliz. ch. 5, or that it was a deception or misrepresentation practised upon him, by which he was induced to become the creditor of B, and to consider the land a fund for his security.

This case is not embraced by the statute of 13 Elizabeth, ch. 5.

The sureties, having full knowledge of the deeds, and no imposition or concealment having been practised upon them by which they were fraudulently induced to become the creditors of B, and to consider the lands as his property, and answerable for his debts, are not entitled to relief.

B being dead, whether or not his heirs ought to have been made parties?

held by *Roberts* from the time of his and his wife's deed of conveyance to *Thomas.* The deed from *Thomas* to *Roberts* was acknowledged before *Jacob Gibson*, the late complainant, as a justice of the peace, on the day of its date, and was recorded on the 9th of January 1798. In July 1798, *Cox* died, and *Thomas* was commissioned as sheriff, and gave bond according to law, on the 12th of July 1798, with *John Nabb* and *John Thomas*, of *Wye*, as his securities, and acted as sheriff till his death, in February 1802. Omitting to give a bond for his performance for the year 1799, within the period prescribed by law, he gave such a bond, according to the provisions of a special act of assembly, on the 31st of December 1799, with *William M. Catrop* and *Nathan Harrington* as his securities. On the 26th of November 1799, he gave a bond for his performance of the office for the next succeeding year, (1800,) with *Jacob Gibson* and *Benjamin Willmott*, his securities. The complainants state in their bill, that they entered into the securityship by the bond, dated the 26th of November 1799, on the faith of the security, which they looked to in the land conveyed by *Roberts* and wife, to *Thomas*, on the 28th of September 1797, and reconveyed by *Thomas* to *Roberts* on the 29th of November 1797; and they allege, that the deed from *Thomas* to *Roberts*, of the 29th of November 1797, is fraudulent, and that the property therein mentioned is liable for certain debts which they allege they have paid as securities of *Thomas*.

Kilty, Chancellor, at February term 1811, as the grounds of his decree, stated, "that with respect to the parties, he must consider those originally named as being still the complainants, notwithstanding the writing filed by *Nathan Harrington*, and the deposition by *Benjamin Willmott*, inasmuch as they had not applied to the court to be struck out of the bill. As to the merits of the case, it is to be observed, that no suits on a similar account has been brought in this state, and therefore this must be decided on principles of equity, without the aid of any express authority. He considers the conveyance from *Roberts* and wife, to *Thomas*, and the reconveyance from *Thomas* to *Roberts*, under the bond for that purpose, to have been made by collusion, and to have been fraudulent as against subsequent creditors, or at least against those who became

1823.

Roberts
vs
Gibson

so on account of transactions relating to the office of she-
riff; and also as against the public or the state, the execu-
tive of which was bound to commission *Thomas* on the re-
turn of the judges, who judged of his property from the
land conveyed by *Roberts.* And the statute of 13 *Eliza-
beth, ch.* 5, he considered as extending to duties as well as
debts. If *Thomas* had retained the land so conveyed to
him, it would have been liable for his debts, and his public
creditors, to whom the complainants have been made an-
swerable, might have resorted to it. And the chancellor
is at present of opinion, that the complainants were, on
payment of such claims, entitled by substitution to stand
in the place of the original creditors; and that the land
must be followed in equity, and made liable to their claims,
the amount of which it is necessary to ascertain, in order
to ground a decree for the payment thereof, or a sale of the
land for that purpose." He *decreed,* that the auditor state
an account. The account which the auditor stated was be-
tween *Thomas* and *Gibson,* making the former indebted to
the latter $5862 47. To this account objections were
made by the defendants, but they were overruled by the
chancellor, who ratified and confirmed the auditor's report,
and decreed a sale of the land, unless the defendants
should, by a particular day, bring into court, to be paid to
the complainants, the sum of $5862 47, with interest, &c.
From this decree *E. Roberts,* the devisee, appealed to this
court.

The cause was argued before BUCHANAN, MARTIN, and
DORSEY, J.

*Wirt,* (Attorney General of *U. S.) Magruder* and *Kerr,*
for the Appellant, contended, 1. That the deed from *Tho-
mas* to *Roberts* of the 29th of November 1797, was *bona
fide,* and valid, and not fraudulent, and that the complai-
nants had no lien, either legal or equitable, affecting the
land conveyed by it.

2. That *Jacob Gibson,* one of the complainants, having
had full notice of the conveyance of the 29th of Novem-
ber 1797, before he entered into his suretyship, was not
deceived or defrauded thereby, and was not entitled to
any relief against that deed.

3. That the proper parties had not been made, either
as complainants or defendants.

4. That *Gibson's* own acknowledgments and declara-tions, as contained in the record, that he would gain by his suretyship, were a bar to his recovery.

They argued, 1. That the allegations in the bill, and the proof, did not correspond, and referred to *Clarke vs. Turton,* 11 *Ves.* 240. *Whaley vs. Norton,* 1 *Vern.* 483. *Cooper's Plead.* 7, 14, 16. *Hayward vs. Carroll,* in this court, at June term 1819.

2. That the 42d article of the constitution did not con-template that the property qualification, required by that article as necessary for the sheriff to make him eligible as such, should be bound to all creditors, and be a fund to answer for all his defaults, and all demands upon him as sheriff, in addition to the bond required of him. It meant that there should be a bond with sureties, given by the sheriff, before he could act as such, which bond was to answer for all defaults by, and demands against the she-riff. The 5th article of the declaration of rights shows the spirit with which the framers of the constitution were actuated as to property qualifications of persons elected to office, and having a right to vote. It was not intended as a fund for the payment of debts, but to narrow down the number of persons to be selected for office, and as having a right to vote; and shows that it was to restrain the popular will. They referred to the 2d, 15th, 21st, 27th, and 30th *articles of the constitution.*

3. To show that this case was not affected by, and did not come within the statute of 13 *Elizabeth, ch.* 5, they referred to 1 *Fonbl.* 26, (note k.) *Doe vs. Routledge, Comp.* 705. *Russell vs. Hammond,* 1 *Atk.* 13. *Walker vs. Burrows, Ibid* 93, 94. *Newl. on Cont.* 376, 377, 384, 386. *Townshend vs. Windham,* 2 *Ves.* 10. *Shaw vs. Standish,* 2 *Vern.* 327. *White vs. Sansum,* 3 *Atk.* 412. *Twyne's Case,* 3 *Coke,* 80. *Nun vs. Wilsmore,* 8 *T. R.* 530. *Meux vs. Howell,* 4 *East,* 13; and *Lush vs. Wilken-son,* 5 *Ves.* 387. That the allegation, that the public is defrauded, and through the public, the creditors, and through the creditors, the sureties of the sheriff, had no foundation. This court cannot be called upon by a private individual to redress the wrong done to the community; and *Gibson* cannot stand in the place of the public. Relief is never granted where both parties are equally guilty of a breach of the law. *Lowry vs. Bour-*

1823.

Roberts
vs
Gibson

dieu, 2 Doug. 468. 1 Pow. on Cont. 201. 2 Pow. on Cont. 149. These cases will explain the reason of the decision in *Jeckinen vs. Mitchell.* Gibson was not a creditor of the sheriff within the constitution. He voluntarily became surety, and did not, as a creditor, trust the sheriff; and not being a creditor, he cannot be relieved. He cannot be placed by substitution in the place of the creditors. 2 *Eq. Ca. Ab.* 203, 252, 255. 1 *Eq. Ca. Ab.* 142. 2 *Fonbl.* 299, 301, 302. *Jackson vs. Ham,* 15 *Johns. Rep.* 261. If the constitution was violated, it was not for the complainants to complain; but if it was, their remedy was at law and not in equity. *Vernon vs. Keys,* 12 *East,* 638. *Clifford vs. Brooke,* 13 *Ves.* 132. It must appear that the party claiming was deceived and defrauded, and thereby sustained an injury. The bill should state that the complainants were deceived, and while under that deception became sureties.

4. There were material and necessary persons who should be parties. The heirs of *Thomas* should be parties if the deed was null and void. *Rob. on Fraud. Convey.* 591, 592, 596, 598, 602. *Hollins vs. Barney,* in this court, at June term 1816.

5. A man defrauded with notice, if such a thing could be, can have no relief. *Cowen vs. Simpson,* 1 *Esp. Rep.* 290. 2 *Esp. Dig.* 365. *Grant vs. Naylor,* 4 *Cranch,* 236. Persons claiming by substitution must come into court with clean hands. This contest is solely between *Gibson* and *Roberts,* and *Gibson,* having knowledge of the fraud, has no right to claim contribution or substitution. *Cheesbrough vs. Millard,* 1 *Johns. Chan. Rep.* 409. *Stevens vs. Cooper,* Ibid 425. *Gill vs. Lyon,* Ibid 447.

6. The act of 1809, *ch.* 198, repealing the property qualification for appointments to office, all rights before acquired are repealed, the right and remedy thereby ceased, and there is an end of this case. *Yeaton vs. The United States,* 5 *Cranch,* 281. *The Schooner Rachel vs. The United States,* 6 *Cranch,* 329.

7. The chancellor has decreed in favour of one of the complainants only, and has said nothing with respect to the others.

*T. B. Dorsey,* (Attorney General,) and *Taney,* for the Appellees, stated, that it would not be contended that this case came within the statute of 13 *Elizabeth,* ch 5. That

the variance between the bill and the proof was of no importance, as the complainants might resort to 'he general statement in their bill, and if enough appeared to entitle them to relief, they might obtain it. *Cooper's Plead.* 7.

1. It appears by the facts that the fraud commenced with *Roberts*; and whether the 42d Article of the Constitution was founded in policy or not, it must be carried into effect. The object of the constitution was, that the sheriff should *bona fide* possess, when elected, real and personal property of the value of at least £1000. His not being so possessed *bona fide* of real and personal property to that amount, but possessed of property not *bona fide*, but belonging to another, was a fraud against which the court would grant relief. They cited *Huguenin vs. Basely*, 14 *Ves.* 273. *Eastabrook vs. Scott*, 3 *Ves.* 456. *Mawson vs. Stock*, 6 *Ves.* 300. The real and personal property of the sheriff, as well as his bond, are answerable for the faithful performance of the duties of his office. *Hatcheson vs. Tilden & Bordley*, 4 *Harr. & M'Hen.* 279. Conveyances *in fraud of the law* are relieved against. 1 *Madd. Chan.* 240, 242. *Birch vs. Blagrave*, *Ambl.* 266. The principle of the law in respect to fraud, is the same with respect to the public, as in relation to individuals. *Evans vs. Bicknell*, 6 *Ves.* 182, 192. *Sadler & Jackson, Ex parte*, 15 *Ves.* 52, 53. *Curtis vs. Perry*, 6 *Ves.* 747. *Jackman vs. Mitchell*, 13 *Ves.* 581. Where a party enables another to commit a fraud, he is answerable for the consequences. 1 *Madd. Chan.* 205, 256. Where both parties intend a fraud, and one is not so culpable as the other, relief will be apportioned according to the degree of their criminalty. *Austin vs. Winston*, 1 *Hen. & Munf.* 33. No matter, therefore, if *Gibson* was a party to the fraud, he will be relieved. *Birch vs. Blagrave*, *Ambl.* 264. As between *Roberts* and *Thomas* the deeds are valid, but as respects the public they are void. *Bedford vs. Coke*, 2 *Ves.* 116.

2. There was no evidence that *Gibson* had knowledge of the fraud, although it might be admitted that he had. Sureties paying debts are to be substituted in the place of creditors. *Ex parte, Rushforth*, 10 *Ves.* 414, 422. *Wright vs. Morley*, 11 *Ves.* 22. *Parsons vs. Breddock*, 2 *Vern.* 608. *Miller vs. Ord*, 2 *Binney's Rep.* 382. *West vs. Belches*, 5 *Munf.* 187. *Brengle vs. Creager*, 5 *Harr. &*

1828.

Roberts
vs
Gibson

1823.

Roberts
vs
Gibson

Johns. 234. *Ghiselin & Worthington vs. Ferguson*, in this court at June term, 1819.

3. That the proper parties have been made, they referred to *Lee vs. Rook*, *Mos.* 318, cited in 2 *Brid. Index*, 460; pl. 5.

4. That as it respected the parties to the contract, it was valid, and was only void as to creditors. 3 *Bac. Ab.* tit. *Fraud. Cooper's Plead.* 34.

5. If the decree was erroneous in awarding the whole sum to only one of the complainants, this court was competent to correct it in that particular, and say how the money was to be appropriated.

The opinion of the court was delivered by

MARTIN, J. Many points of minor importance were presented to the court in the argument of this case, which under different circumstances ought to be duly considered, but as our opinion is formed upon the law arising upon the pretended merits of the case, as disclosed by the evidence, it is not necessary to take them into consideration. Although the bill of complaint purports to represent the interest of four complainants, three of that number, *Catrop*, *Harrington* and *Wilmot*, expressly disclaim all knowledge of the proceedings; that they were instituted without their consent, and have been prosecuted without their participation; and indeed it is evident to the most superficial observer, that although their names have been used, no attention has been paid to their interest. It appears from the evidence, that both *Catrop* and *Harrington* had paid money on account of their suretyship for *Thomas*, yet the auditor, in his report, takes no notice of their claims. He ascertains the amount due to *Gibson* alone, and seems to consider him as the sole complainant in the cause. The transaction is represented by the evidence very different from the statement in the bill; indeed the variance in detail is so great as to make it entirely another case. The bill states a joint cause of action, arising upon one bond, signed by all the complainants; the evidence is, that there were two bonds, the one by *Catrop* and *Harrington*, as securities, the other by *Gibson* and *Wilmot*, and given to secure the faithful performance of the duties of the office *for different years*. The bill represents the bond to have been executed prior to the reconveyance to

*Roberts;* the testimony proves it to have been nearly two years afterwards; and to close the climax, the bill declares an entire ignorance, on the part of the complainants, of the views and intention of *Thomas* and *Roberts,* when the land was conveyed to *Thomas;* and the testimony shows, that *Gibson* knew all, and was perfectly well acquainted with the transaction. The case presents an anomaly in judicial proceedings, and the court would not hesitate to dismiss the bill, as containing a case totally different from the testimony in the record. Let us, for a moment, inquire, if *Gibson* stands on firmer ground upon the case as disclosed by the evidence?

In the fall of 1797, *Edward Cox* and *John Thomas* were candidates for the office of sheriff for *Talbot* county. The election took place on the first Monday in October, when *Cox* had a majority of votes, and was elected sheriff, and was duly commissioned and qualified as such, and continued to act in the office until the following summer, when he died. *Thomas,* having the next highest number of votes to *Cox,* was on the return with him, and after his death was commissioned as sheriff for *Talbot* county. On the 12th of July 1798, he entered into an official bond as sheriff, with *John Nabb* and *John Thomas,* (of *Wye,*) as his securities. On the 31st day of December 1799, he entered into a second bond with *William M. Catrop* and *Nathan Harrington* as securities; and on the 26th day of November 1799, into a third bond, for the due performance of his office, with *Jacob Gibson* and *Benjamin Wilmot* his securities. *Thomas,* not being possessed of real and personal property sufficient to make him eligible as sheriff under the constitution, *Edward Roberts,* and his wife, on the 28th of September 1797, conveyed to him a tract of land called *Farmer's Delight,* in order thereby to qualify him for the office, and took from *Thomas* a bond for the reconveyance of the same. No money consideration was paid by *Thomas* for this land, but it was agreed between him and *Roberts,* if *Thomas* kept the land he was to pay *Roberts* one thousand pounds for it. *Thomas* having failed to be the first on the return at the election, on the 29th day of November 1797, reconveyed the said land to *Roberts,* his wife, *Henrietta Thomas,* being a party grantor in the deed, which was acknowledged before *Jacob Gibson* and *James Nabb,* justices of the peace, and re-

corded in due time.   *Gibson*, at the time this acknowledgment was taken, explained to Mrs. *Thomas* the object of the deed, that it was to reconvey certain land that had been conveyed to *Thomas* by *Roberts* to make him eligible as sheriff.  *Thomas*, when the land was conveyed to him, and also when it was reconveyed to *Roberts*, was free from and unincumbered by debt, but died some time in the year 1802, insolvent.  *Gibson* paid considerable sums of money as the security of *Thomas*, on account of his official misconduct, and filed this bill to have a sale of the land called *Farmer's Delight*, considering it a fund answerable for *Thomas's* official debts.

The first question presented for the consideration of this court, is, the true construction of the *forty-second* article of the constitution of this state, whether the property qualification required by that article was intended as a fund to secure the sheriff's official creditors, in addition to the bond required of him as sheriff?  By that article it is declared, "that no person shall be eligible to the office of sheriff for a county, but an inhabitant of said county, above the age of twenty-one years, and having real and personal property in the state above the value of one thousand pounds current money.  That bond, with security, be taken every year as usual, and no sheriff shall be qualified to act, before the same is given."  Were we left to this article alone, to infer the intention of the convention in passing it, much difficulty might arise upon it, although even here, they point out the security they intend to provide for the safety of official creditors, that no act shall be done as sheriff until that bond be given which is directed for their protection.  But we are not confined to this article alone, to ascertain their intention.  We are to take the whole instrument together, and collect their views from its general context, and may call other clauses of the constitution to aid us in the construction of that which may be doubtful or uncertain.  If this were the only property qualification required by the constitution, a reference to other parts for instruction might be hopeless.  But that is not the case.  It has required the same kind of qualifications from a variety of persons, on whom it meant to confer a privilege or bestow an office.  It is a rule in the construction of statutes, and *a fortiori*, of the constitution, that where the same language is used, in different clauses

1823.

Roberts
v.
Gibson

of an instrument, upon the same or similar subjects, it shall receive the same construction, unless some particular reason can be assigned to take it out of the general rule. By the *second* section of the constitution, a property qualification of fifty acres of land, or thirty pounds in money, is required of every person who shall vote for a delegate to the general assembly, and that the person elected shall have real or personal property above the value of five hundred pounds current money. By the *fifteenth* article, a senator must have real and personal property above the value of one thousand pounds current money. By the *twenty-first* article, a member of the council must possess a freehold of lands and tenements above the value of one thousand pounds. By the *twenty-seventh* article, a member of congress is required to have real and personal estate, above the value of one thousand pounds; and by the *thirtieth* article, the governor must have in the state real and personal property above the value of five thousand pounds current money, one thousand pounds whereof at least to be of freehold estate. For what purpose was the property qualification required in the cases just enumerated? Was it intended as a fund for the security of creditors? The counsel for the appellees have not contended for so wild a proposition. It was to confine the privileges, or offices bestowed, to those who had at least some property at stake in the community, and from which a certain degree of respectability and standing in society might be presumed. Since, then, the same language is used in those articles of the constitution requiring a property qualification of the governor, members of the council, &c. with that of the *forty-second* relative to the sheriff, and it is conceded, that in the first cases it was not intended as a fund to secure creditors, it is fair to give all the same construction, unless some reason can be assigned to show the convention did not so intend it. The counsel for the appellees have attempted to draw a distinction between those clauses, from the peculiar nature of the duties of the sheriff; that as he was an officer into whose hands much of the public money must be placed, it is to be inferred, the property qualification was required of him for a different purpose than of the other cases mentioned in the constitution. In examining that instrument, nothing is to be found to justify that position. It affords strong evidence to the con-

trary. Can it be supposed that the convention should deem a property qualification necessary, as a fund to secure the creditors of the sheriff, because public money may be placed in his hands, and yet that no such qualification should be required of the treasurer, who is the great depositary of the public wealth? Yet we find a treasurer is to be appointed by the legislature, and no property qualification is required of him.

If the property qualification was intended as a fund to secure the sheriff's official creditors, the constitution would have given them a specific lien upon it; that, like the sheriff's bond, it should be reserved for their benefit, in exclusion to all other creditors; for otherwise it would be useless and nugatory. Yet, it has been admitted, that is not its legal effect; that the official creditors have no lien upon it, and that it is answerable for his private debts, before he performs one official act. He can make a *bona fide* transfer of all his property, the day after he is commissioned, and his official creditors have no claim upon it. If he has one thousand pounds of real and personal property in the state, he is eligible as sheriff, although at the time of his election there may be judgment creditors against him who have a lien upon his property, and for whose use it may be sold, to ten times the amount of that sum. How then can it be considered as a fund for the peculiar benefit of official creditors, unless it is presumed that the collected wisdom of the state, the framers of the constitution, when they intended to give them this security, did not know how to carry it into effect? The creditors of the sheriff, as such, having no lien upon this property, and that it may be appropriated in many ways, in exclusion of their interest, is strong evidence, in addition to that afforded by the constitution itself, that it was not intended as a fund for their security, but that the convention had different views, perhaps those before mentioned, in requiring a property qualification.

It has been contended, that although the property qualification was not intended as a fund to secure the creditors of the sheriff, yet the deeds between *Roberts* and *Thomas* were a fraud upon the law, and *Gibson*, as a creditor of *Thomas*, has a right to have the land sold for the payment of his debt. Admit the position to be correct, that this transaction may be considered a fraud upon the law, it

does not necessarily follow that every subsequent creditor of *Thomas* can take advantage of it. If *Thomas* had refused to reconvey this land to *Roberts*, the law never would have lent its aid to *Roberts*, who was *particeps criminis*, to obtain its restoration; it would not enforce the performance of a contract made in violation of its policy; but if a third person, a subsequent creditor, attempts to vacate the deed of re-conveyance on account of the fraud against the public, he must show, either that it was fraudulently against creditors generally under the statute of 13 *Eliz. ch.* 5, or that it was a deception, or misrepresentation, practised upon him, by which he was induced to become the creditor of *Thomas*, and to consider the land a fund for his security.

It would be superfluous to make any remarks on the operation of the statute of *Elizabeth*, for although it is considered by the chancellor as a strong ground to support his decree, it has been disclaimed and abandoned by the counsel for the appellees; they have admitted this case is not embraced by the statute, and therefore it is unnecessary to assign the reasons why the court concur with them in that concession.

Does this record then afford any evidence to show *Gibson* was in a predicament to complain of the fraud against the law? Was he an innocent creditor, deceived and defrauded by a secret agreement between the parties, of which he had no knowledge, and against which he could not guard himself? Was any imposition or concealment practised upon him, by which he was fraudulently induced to become the creditor of *Thomas*, and to consider this land as his property, and answerable for his debts? So far from it, it appears he was conversant with the whole transaction for more than two years before he became the security of *Thomas;* he had a perfect knowledge of the views of the parties from the commencement to the completion of the business. He tells Mrs *Thomas* the deed to her husband was intended to make him eligible as sheriff; yet he claims relief in his bill, because he did not know, at the time he entered into the bond with *Thomas*, there was a secret agreement between the parties.

But is *Gibson* himself untainted with the fraud against the public, of which he now so loudly complains? Is he *rectus in curia*, and entitled to relief in a court of equity?

The degree of moral and legal guilt, between him who commences, and he who aids in the consummation of a fraud against the public, knowing one is intended, is so slight, as to be almost imperceptible. 'Tis true it does not appear that *Gibson* was a party to the original fraud; but did he not, with a knowledge of that fraud, lend his aid to the parties to consummate it, and practice it upon the public? By the constitution *Thomas* could not have been elected sheriff without possessing property to the value of one thousand pounds, and to make him eligible, *Roberts* conveyed to him this land; this was a fraud upon the policy of the law. But had it stopped here, the fraud could have produced no injurious effect, no creditor could have suffered by it, because *Thomas* could do no act as sheriff, until he gave a bond, with security, for the faithful performance of his office. *Gibson* knew the fraud had been contemplated, and partly executed. He knew it could produce no effect without a bond and security, and yet, with a full knowledge of all the facts, he becomes the security in the bond, and thereby enables the party to practice the fraud upon the public. He was a volunteer with notice, and does not come into a court of equity with clean hands, when he claims relief against a fraudulent transaction, which could have produced no injury, without his aid to carry it into effect.

The court think the decree of the chancellor is erroneous and ought to be reversed.

DECREE REVERSED.