# MARYLAND REPORTS.

## APRIL TERM, A. D., 1882.

*Daniel R. Brant vs. John F. Ehlen, John M. Denison, Joseph Wilkins and others.

*Corporation—Subscribers—Sale of shares of Stock as Full paid shares—Bona fide purchasers—Creditors—Unpaid subscriptions—Trust fund—Coal lands in Payment of Capital stock of a Mining Company—Property in Payment of Capital stock.*

Where shares of the capital stock are issued by a corporation to the original subscribers as full paid shares, and are sold by them as such, a purchaser thereof in good faith, cannot be held liable to a creditor of the corporation in the value of his stock as for unpaid instalments.

The unpaid subscriptions of a corporation become insolvent, in the hands of a *bona fide* purchaser without notice, do not constitute a trust fund which may be pursued by the creditors of the corporation, and subjected to the payment of their claims.

A company incorporated for the purpose of mining and shipping coal, and empowered by the laws of the State wherein it was incorporated, to purchase and hold mineral lands to the extent of ten thousand acres, may lawfully purchase coal lands, and pay for the same in the stock of the company.

A corporation may receive in payment of shares of its capital stock any property which it may lawfully purchase, and so long as the transaction stands unimpeached for fraud, Courts will treat as a payment that which the parties themselves have so regarded, and this, too, in cases where the rights of creditors are involved.

*The displacement of this case and the one immediately following, from their chronological order, is due to the fact that in each there was a motion for re-argument pending. The motions were overruled.

APPEAL from the Circuit Court of Baltimore City.

The appeal in this case was taken from a decree of the Court below, dismissing the bill of the complainant. The case is stated in the opinion of this Court.

The cause was argued before BARTOL, C. J., STONE, GRASON, MILLER, ALVEY, and ROBINSON, J.

*Charles Marshall,* and *William A. Fisher,* for the appellant.

It is the doctrine of the American Courts that the unpaid instalments of the capital stock constitute a trust fund for the payment of its debts, to be administered honestly by the directors, so long as the corporation is a going concern, but subject to the powers of Courts of equity, for the prevention of any misapplication, and for its administration, when the directors have failed or ceased to perform their duties in regard to it. It is a trust fund, for such purpose, in the same sense that all other property of the corporation is to be so treated. *Thompson on Liability of Shareholders, sec.* 10.

Nowhere has the rule been more forcibly and fully stated than in the Supreme Court of the United States. The most recent cases there have arisen in the administration of the estates of bankrupt corporations, but it has been always relied upon as an equitable principle and was first enunciated there in an equity proceeding quite similar to that adopted in this cause. *Hatch vs. Dana,* 101 *U. S.,* 205; *Hawley vs. Upton,* 102 *U. S.,* 314; *County of Morgan vs. Allen,* 103 *U. S.,* 498; *Curran vs. Arkansas,* 15 *How.,* 304, 307–8; *Ogilvie vs. Knox Ins. Co.,* 22 *How.,* 380; *Sawyer vs. Hoag,* 17 *Wallace,* 619–21; *Upton vs. Tribilcock,* 91 *U. S.,* 47–50; *Sanger vs. Upton,* 91 *U. S.,* 59–60.

Some of the cases cited were proceedings by assignees of bankrupts, but the Court treated the rule relied upon, as not one arising out of the bankrupt law, but out of the

application of the equitable rule to the proceedings in bankruptcy. 107 *U. S.*, 205.

It is singular that a principle, so promotive of good faith and fair dealing should not have been accepted by the English Courts. It is nevertheless true that it has not been adopted there. The English Courts do not recognize the existence of the trust fund for creditors, or treat the unpaid instalments as part of it. The right of the creditor must be asserted through and based entirely upon that of the corporation. By the English rule, if the company is estopped by its contract from asserting that the shares are not fully paid, the creditor is equally estopped. *Thompson on Liability of Shareholders,. sec.* 133. The English doctrine was asserted in argument, in *Sawyer vs. Hoag*, 19 *Wallace*, 619, but it met with no favor.

So wide a diversity of decision upon a point so fundamental, has naturally led to differences equally as radical upon other questions as to the liability of subscribers and shareholders. It is not astonishing then that there exists an "American" doctrine which forbids the transfers of shares in a failing company for the purpose of evading liability, while there is an "English" one, that there may be a transfer to a man·of straw for the sole purpose of escaping liability. *See Thompson on Liability of Shareholders, secs.* 211–215.

A Court of equity takes cognizance of the subject-matter by virtue of its jurisdiction as to trusts, and it is not absolutely necessary that all creditors should be made parties. *Thompson on Liability of Shareholders, sec.* 258; *Ogilvie vs. Knox Ins. Co.*, 22 *How.*, 391–2; *Hatch vs. Dana*, 101 *U. S.*, 205, 210, &c. The Court of equity will take the place of the directors, and make the calls which they ought to have made upon the subscribers. *Hatch* vs. *Dana*, 101 *U. S.*, 214.

The assignors of the stock, who have come into privity with the company, by having the transfers made to them

upon the books, are liable for the unpaid subscriptions. *Webster vs. Upton,* 91 *U. S.,* 69, *&c.; Bond vs. Susq. Bridge Co.,* 6 *H. & J.,* 132–3; *Hall vs. Ins. Co.,* 5 *Gill,* 499.

There are two relations which subscribers to the stock of a company, and their assignees occupy. One is the relation to the company itself, and that is merely the relation that grows out of the contract of subscription, the relation of debtor and creditor. That relation is controlled entirely by the terms of the contract of subscription. It may be made the subject of agreements between the company and the shareholder, agreements that will bind the rights of the parties as between themselves. The company may release the stockholder, or may refuse to make a call for payment, and as between *them,* the release would be good, and the failure to make a call would prevent the company from bringing a suit. *Taggart vs. W. Md. R. R. Co.,* 24 *Md.* To this relation the right on the part of the subscriber to plead a set-off when sued for a call is incident, as in the case of any ordinary suit to recover a debt.

The other relation, however, is entirely different. That is, the relation which the subscriber sustains to the creditors, when the company becomes insolvent. As to them, his unpaid subscription is a trust fund, beyond the reach of any agreement between him and the company, tending to impair or divest it. This right of the creditor is not one that he derives from, or prosecutes under the name and authority of the company, but it is an original right of the creditor, not derived from the company at all, but a right which is placed beyond the control of either subscriber or company, or both. No arrangement or agreement between the stockholder and the company, except such as is sanctioned by the organic law of the company, or to which the creditor has consented, can affect his rights.

The stockholder when called on to pay his unpaid subscription, cannot set off against it a debt due him by the

company, because the debts are not due in the same right. Nor can he plead that the company has released him, or agreed to accept performance in some way not sanctioned by the charter.

The radical difference between the English and the American doctrine is, that the former accords to the creditors only such rights as they can assert in the name of the company, and through its contracts, while the latter accords to the creditor rights growing out of the relation of stockholder, impressed upon it by law in his favor from the moment he becomes such, a right dormant, it may be, as long as the company is solvent, and a going concern, but one which becomes active and effectual when the company becomes bankrupt, and attaches itself at once to the subscription, whether paid or remaining in the treasury, or unpaid and still in the hands of the subscribers. *Morrison, &c. vs. Rider,* 54 *Md.,* 431; *County of Morgan vs. Allen,* 103 *U. S.,* 509; *Fiery vs. Emmart,* 36 *Md.,* 473.

This view of the rights of the creditor enables us to meet the propositions with reference to the rights, or supposed rights of those who claim that they took the stock under the belief that it was fully paid. The mistaken belief of these persons cannot affect the rights of creditors who have in no way contributed to the mistake. Even if the stockholder had been deceived and misled into taking the stock by the company, or by his assignor, in the case of an assignee, it would be no answer to the claim of the creditor if the stockholder has not taken immediate steps to rescind his contract, and actually procured its rescission before the failure of the company. To hold any other view would plainly do away practically with the American doctrine on the subject.

The inquiry is, has the subscription been paid, not did the stockholders believe it to have been.

In this case, the debt sued for was contracted while all the present defendants held stock. The suit of Brant was

a constant notice to them that the land might never have been the property of the company, and that if it was not, the stock had never been paid. Still the company went on mining his coal, using some part of the proceeds to litigate with the true owner, and with the presumed knowledge that if it should lose the land, there would never have been a dollar in the treasury in payment of the subscription to the stock. When they failed, and lost the land, there is something almost ludicrous in the claim that Brant shall treat his own land, wrongfully taken from him, as payment of the stock, *because* the stockholders have been disappointed. It seems strange that he should be made to bear the burden of their disappointment. He could not have been worse off if he had lost his case.

Again the assignees of stock, even if they became such by fraud, cannot be allowed to rescind as against their assignors, unless they are in condition to restore their assignors to their original condition.

These assignees held the stock during all the time this large debt was being incurred. The assignors parted with it before there was any debt or any liability. They could very well refuse to receive back the stock from their assignees burdened as it now is with such a heavy liability.

It being ascertained that the unpaid instalments are a trust fund which can be called in by a Court of equity, and that the assignees of the stock must respond to any liability, the next point to be determined is whether the capital stock has been paid up.

[Counsel maintained that there was no stock fully paid.—REP.]

As soon as the relation of shareholder is created, either by subscription, or by becoming the holder of a certificate of assignment, the obligation to pay whatever remains unpaid on the stock arises, and such an obligation, in the event of the failure of the company, is in favor of credi-

tors, even that is beyond the power of the company to release or discharge, except by requiring it to be paid according to law.

Any agreement or arrangement between the company and the shareholder that has for its end, the substitution of some mode of payment of the subscription, other than that prescribed by law, cannot stand against creditors.

The assignee to whom the stock is issued, assumes all the liabilities and acquires the rights of his assignor. *Webster vs. Upton, Assignee,* 91 *U. S.,* 65; *Palmer vs. Lawrence,* 3 *Sandf., S. C.,* 161; *Brigham vs. Mead,* 10 *Allen,* 245; *Hall vs. U. S. Ins. Co.,* 5 *Gill,* 484; *Bend vs. Bridge Co.,* 6 *H. & J.,* 128; *Piscataqua Ferry Co. vs. Jones,* 39 *N. H.,* 491.

If the assignee claims that he has been defrauded in accepting the assignment, he must repudiate the contract as soon as he learns the fraud, and if the company fails, and he is not in a condition to restore the stock to his fraudulent assignor, he is bound, if indeed he be not bound as against creditors in case. It is his duty to inquire. *Upton vs. Tribilcock,* 91 *U. S.,* 45, 55; 6 *B. Munroe,* 553; *Hughes vs. Antietam Co.,* 34 *Md.,* 316; *Pullman vs. Upton,* 96 *U. S.,* 328; *Chubb vs. Upton,* 95 *U. S.,* 665.

There is moreover no pretence that any of the assignees in this case were defrauded. They purchased the stock at very low rates, and while they claim that they supposed it was full-paid, they do not pretend that it was full-paid otherwise than in the way the original shareholders undertook to pay it. The certificates do not represent it as full-paid stock, and the means of knowing all about it was within their reach, as the books of the company were kept in Baltimore where all its officers resided. *Upton vs. Englehart,* 3 *Dil.,* 496, 506; *Nichol's Case,* 3 *De G. & Jones,* 387. As to avoiding liability by assignment. *Morrison vs. Rider,* 54 *Md.,* 431; *Thompson on Liability of Shareholders, sec.* 215, *note.*

*Riley E. Wright*, and *I. Nevett Steele*, for the appellees, William Callow and Leroy Baldwin.

The 5000 shares issued to the original corporators of the Virginia Coal and Iron Company, and paid for in cash, and the 95,000 shares issued to pay for the land purchased by the company, were, in law and fact, full-paid shares.

The company having been incorporated for mining purposes, undoubtedly had the power to buy mineral lands; and it would seem also to be clear that it might pay for these lands with its stock. In such a case there is no reasonable motive for requiring that the company should actually receive the money for the stock, and at the same moment, concurrently, hand it back as purchase money to the vendors of the land. The passing of the money backwards and forwards would manifestly be but an idle form, and the Courts so hold. .

It is clearly shown by the complainant's evidence that by the contract of purchase, the vendors of the land were to receive full-paid stock, and that the 95,000 shares were, in fact issued to them as full-paid. We thus have 100,000 shares, of which 5000 were originally paid for in money, and 95,000 in land; and by "Exhibit J. P. A., No. 2," it appears that the 20,000 shares which Mr. Callow held in his name for five or six months, in 1870, as collateral security, were part of this 100,000. If these shares were full-paid, there is an end of the case as to him.

But it is said, that by reason of the over-valuation of the land, these shares were not in fact full-paid, and that the whole transaction in reference to their issue was fraudulent. In reference to the alleged over-valuation of the land, there is sufficient proof furnished by the evidence offered by the complainant, to show that the stock was issued upon a consideration fairly deemed reasonable and adequate. Mr. Denison's testimony is strong to this effect, and is confirmed by the very large amount of coal

actually taken out by the company; by the evidence contained in the West Virginia record, and by the testimony of the complainant himself, who swears in 1872, that the land was then worth from $100,000 to $500,000. Can the complainant, in the face of his own oath, now insist that the property was only of trifling value? We submit that he is estopped to do so.

Besides, the purchase here was of mineral lands, and it is matter of notoriety, that the value of mining property is speculative and fluctuating, not fixed and certain, and that property supposed to-day to be of small value, may, a few months hence, as the result of further examination and development, be worth an enormous sum. Its value is not capable of precise ascertainment and is largely a matter of speculation. Whether the directors of a company pay for property with money or with stock, it is for them to decide how much they will give for it; and in the absence of fraud, it is submitted that a Court of equity cannot, upon the evidence in this cause, undertake to decide, that the land was not, as matter of fact, according to its estimated value in the market at that time, a fair consideration for the stock issued for its purchase. The stock having been paid for in "money's worth," and issued as full paid, the Courts will not, in the absence of fraud, go into the question, whether the company made a good or a bad bargain. *Thompson's Liability of Stockholders, section* 134; *Code of West Virginia, ch.* 52, *sec.* 253; *Phelan vs. Hazard,* 5 *Dillon,* 45; *Stacey vs. Little Rock R. R. Co.,* 5 *Dillon,* 348-376; *Foreman vs. Bigelow,* 4 *Clifford,* 508; *Spargo's Case, L. R.,* 8 *Ch. App.,* 408-412; *In re British Farmers' Pure Linseed Cake Company, Nichol's Case, L. R.,* 7 *Ch. Div.,* 533-538-9; *Same Case, L. R.,* 3 *Appeal Cases,* 1016, 1017; *De Ruvigne's Case, L. R.,* 5 *Ch. Div.,* 306; *In re Baylan Hall Colliery Co., L. R.,* 5 *Ch. Appeals,* 344; *Pell's Case, L. R.,* 5 *Ch. Appeals,* 11; *Carr vs. Le Fevere,* 27 *Penn.,* 413.

There is no allegation in the bill that the stock was fraudulently issued, nor indeed are proper parties made to raise the question of a fraudulent issue, and therefore that question is not in the case ; and the agreement for the purchase of the land, being that it should be paid for by full-paid stock, and such stock having accordingly been issued, the agreement must stand until impeached for fraud, and set aside by a direct proceeding for that purpose. The Court cannot make a new agreement or contract for the parties; and as they have agreed that the stock should be paid for by the land, that agreement is conclusive until it is rescinded or set aside. In the present attitude of this case, then, the stock must be regarded as full-paid. *Phelan vs. Hazard,* 5 *Dillon,* 45; *Foreman vs. Bigelow,* 4 *Clifford,* 508; *Carling's Case, L. R.,* 1 *Ch. Div.,* 124; *De Ruvigne's Case, L. R.,* 5 *Ch. Div.,* 323; *Swatara R. R. Co. vs. Brune,* 6 *Gill,* 41.

The shares were issued by the company as full-paid. The certificates were in the ordinary form of full-paid stock, with nothing on their face to indicate that they were not full-paid, and they were purchased and held by the defendants as full-paid, with no notice of irregularity or fraud in their issue. The defendants were, therefore, innocent purchasers of the shares for value, and took them free from any equities, which might have existed against those to whom the shares were originally issued. A contrary doctrine would virtually destroy the transferable nature of shares, and paralyze the whole of the dealings with shares in corporations. Certificates of stock, with powers of attorney indorsed on them, constantly pass through many hands without being actually transferred on the books of the company; and although not strictly negotiable instruments, they are called by the Courts *quasi* negotiable, and purchasers of them "are not required to suspect fraud, or to institute inquiries where all seems fair."

It may be added that the new charter of the company which recites that its whole capital stock had been paid, was granted on the 19th day of May, 1870. Nobody, even if put upon inquiry, was bound to go behind this recital. Mr. Callow's name appeared on the books of the company, as holder of the stock which had been pledged to him, not until August, 1870, and his purchase of the stock for his son and son-in-law did not take place until January, 1871. The recital in the charter is to be taken as true until the contrary is proved. *Wellersburg Road vs. Young*, 12 *Md.*, 476.

The creditor, if any fraud has been committed by which his rights are impaired, may proceed against the perpetrators of the fraud; or if the holder of the shares bought them with notice that they were not full-paid, he may proceed against such holder, but in no case is he permitted to recover against an innocent purchaser of shares, issued by a corporation as fully paid. It will be found, we think, that in all the cases relied upon by the other side—it appeared on the face of the transaction of purchase, in some way or form—that the shares were not full paid. *Thompson's Liability of Stockholders, sec.* 135; *Stacy vs. Little Rock Company,* 5 *Dillon,* 372; *Foreman vs. Bigelow,* 4 *Clifford,* 544, 545; *Ex parte Currie,* 3 *De G., J. & G.,* 367; *Nichol's Case, L. R.,* 7 *Ch. Div.,* 533-8-9; *Same Case, L. R.,* 3 *Appeal Cases,* 1016; *Waterhouse vs. Jamieson, L. R.* 2 *Scotch App.,* 29; *Hall vs. Rose Hill Road Co.,* 70 *Illinois,* 673–5; *Lowry vs. Com. & Farmers' Bank, Taney's Rep.,* 310; *Sawyer vs. Hoag,* 17 *Wallace,* 619; *Burke vs. Smith,* 16 *Wall.,* 390–401; *New Albany vs. Burke,* 11 *Wall.,* 105.

Upon the whole case, as presented by the bill and the evidence, the complainant's claim against the respondents is utterly bare of equity, and cannot authorize or justify the relief which he prays. To take Mr. Callow's case as an illustration, he took 20,000 shares of the stock as collateral security, and afterwards purchased it and gave it

to his son and son-in-law—it was not worth, in the market, thirty-two cents a share. The certificates of the stock were issued as full-paid, and were in the ordinary form of a full-paid stock. He took them as full-paid, without notice of any question as to their fairness. The transfer from Crawford to him did not in any way affect or injure the complainant; and yet out of these facts, it is claimed that an equitable liability of Mr. Callow to the complainant for $90,000, with interest for some years, is to be worked out and enforced. The claim upon the face of it is unreasonable, unjust and monstrous, and we submit that nothing short of an express and stringent statutory provision would induce any Court to sustain it.

The complainant never gave credit to the company on the faith of the stock subscriptions, but claims damages for an alleged tort committed by the company or its directors, and which, by earlier action on his part, he might have prevented. He has no claim against the stockholders at law. His bill invokes, and is founded upon the principle—which is the creature of Courts of equity, and only to be applied where equity requires and sanctions it—that a creditor of an insolvent corporation may, in equity, have the unpaid subscriptions of stockholders appropriated to his payment. This is not a technical or legal right of the creditor, but a remedy which Courts of equity give him, when he is found to be equitably entitled to it.

The defendants do not question the trust-fund doctrine, but they object to being called upon to make up a trust-fund for the benefit of complainant, in a case where there is no equity on his part, and no equitable responsibility on theirs.

Even in exercising its jurisdiction to enforce the decree of another Court *inter partes*, a Court of equity will only act when its conscience is satisfied, upon examination, that it ought to do so. *Story's Equity Pleading*, secs. 429, 430, 431.

But here there is a decree against the Virginia Coal and Iron Company, obtained in 1877, three years after that company had ceased to do business or keep up its organization, and when it was virtually dissolved and dead. The case was substantially undefended by the company. The complainant's own affidavit, filed in the case, says, that the company was "hopelessly insolvent as a company, and its property sold out under a mortgage, in October, 1874, as I have learned from its President and Secretary, who claimed that it was dissolved and out of existence. The President, John F. Wiley, stated, under oath, in the City of Baltimore, February 21st inst., that they as a company had no counsel." A decree in a case so situated is now sought to be made the equitable foundation upon which to ask the aid of a Court of equity against the defendants. The Court below not only was not bound to enforce such a decree against the defendants, but the duty was imposed on it, to look into the whole case as developed before it, and only to grant the relief prayed if it was satisfied that in conscience and equity the complainant was entitled to it, as between him and the defendants.

The West Virginia decree was hard and inequitable. The measure of damages by which it held the company responsible for an enormous sum, though sanctioned by this Court in an action of trespass, would, we think, not be considered just and proper in equity, under the circumstances of this case. Then the circumstances and manner under which the complainant's title to the land was acquired, and his laches and lying by, waiting until the company had not only developed the mineral value of the land, but had incurred large expenditures in the necessary preparations for mining, ought to shut him out from recovery in a Court of equity against these defendants, who were innocent purchasers of the stock.

The allegation of the bill upon which the whole case rests, is that the stock was not fully or sufficiently paid

for by the land, and the evidence not only fails to prove this, but the West Virginia record, and the testimony taken. here by the complainant proves the contrary. This is an insurmountable objection to the complainant's recovery. But his case is even worse than this, for in the Virginia case he · sought to strengthen and increase his claim for damages by proving the value of the land; and he, himself, swore that from all the sources of information he could get, it was worth in 1872 when large quantities of coal had been taken out, from $100,000 to $500,000; and having upon this, with other testimony, obtained his decree in West Virginia for an enormous sum, he brings that decree into a Maryland Court, and in the face of it asks the Court to hold the Maryland stockholders liable to him for this enormous sum, on the ground that the land, before any coal was taken out, was only worth about $10,000. A Court of equity cannot sanction such a procedure by a decree in his favor.

*J. Morrison Harris,* for the appellees, Rachel D. Crawford, and himself as administrator of E. Wyatt Blanchard, deceased.

The decree obtained by the appellant against the "Virginia Coal and Iron Company" in the Circuit Court of the United States, for the District of West Virginia, is not binding upon the defendants, stockholders in said company, who were neither parties nor privies to the suit in which said decree was rendered. A judgment is conclusive only when the same question is in issue between the same parties or privies. *Niller vs. Daneker,* 27 *Md.,* 12; *Cecil vs. Cecil,* 19 *Md.,* 72; 2 *Smith's Leading Cases,* 821, 825; *Vose vs. Morton,* 4 *Cush.,* 27. It binds parties and privies only upon the principle that it is *res adjudicata.*

Stockholders are not *parties* to a suit against the corporation, which is a distinct legal entity—a person in law—

with distinct rights, powers, duties, and liabilities of its own. This has been expressly decided. in this State. *Downs' Exc'rs vs. Md. and Del. R. R.*, 37 *Md.*, 104; *Cecil vs. Cecil*, 19 *Md.*, 72, 78, 79, 80; *City Bank vs. Bateman*, 7 *H. & J.*, 109; see also, *Sinclair vs. Sinclair*, 13 *M. & W.*, 640.

One not a party to an action, nor notified of its pendency, having no opportunity or right to control the defence, to introduce or cross-examine witnesses, or to prosecute a writ of error from the judgment therein, is not bound by such judgment. *Hale, et al. vs. Finch*, 104 *U. S.*, 261.

A Court of equity, that can act alone on the convictions of its own conscience, is under no obligation, and indeed ought not, to enforce a decree of a similar Court of another State, when such enforcement is pressed against stockholders who were not parties nor privies to the proceedings in which it was obtained, and especially when the Court is not fully satisfied that it would be equitable so to enforce it against such stockholders.

And the Court is entitled to look into such decree whenever the essential rights of parties are influenced by the nature of the original contract, for the purpose of ascertaining what the nature of such original contract was. 12 *Pick.*, 580, 581; *Evans vs. Sprigg*, 2 *Md.*, 473; *Weber vs. Fickey*, 47 *Md.*, 196, 200.

And this view may be held peculiarly applicable in this case, where the decree sought to be enforced is bottomed upon tortious acts of the corporation for which shareholders are not personally liable. *Thompson on Liability of Stockholders*, 7.

More particularly, where, *as in the case of these respondents*, no stock was issued to them until three years after the filing of the bill, alleging the *torts* upon which the decree is based, and when all indebtedness claimed by the appellant had accrued.

*Severn Teackle Wallis,* for the appellees, D. J. Foley & Brother, A. J. H. Way, and the administrators of John Murphy, deceased.

The rule adopted by the District Court of the United States for West Virginia, in the ascertainment of what is claimed to be a "debt" due by the Virginia Coal and Iron Company to the appellant, is altogether at war with the received principles and practice of equity. It places an account taken in equity, under a bill for an injunction and account, against a defendant whose liability has accrued under an honest, though mistaken, claim of title. upon the same footing, in the matter of damages, as an action of tort, at common law, against a conscious and wilful wrong-doer. Even at law, the difference, in liability for damages, between a wilful and an unconscious trespasser is fully recognized by this Court in the case of the *Barton Coal Co. vs. Cox,* 39 *Md.,* 1. And it would clearly be against reason to hold otherwise. The principle of punitive damages in such cases—over and above compensation—can only apply where there is something which ought to be punished, and where public policy, for the purpose of prevention, justifies the infliction of punishment, in that shape, at the hands of a jury. There is no public policy requiring parties in possession, under honest and fair claims of title, to abstain from acting, in good faith, upon their theory of their rights as they may be advised. And certainly, until the decision of the Supreme Court upon the title to the lands in controversy, it is respectfully submitted, that no lawyer or party can be held to have been altogether rash in the conviction, that the judgment of that high tribunal would be the opposite of that which it pronounced. But, whatever may have been the difference in Courts of law, arising for the most part out of the forms of actions at law, in the cases in which the question has arisen, it is respectfully submitted that the principle of equity, whenever it deals

with the matter of damages, is one into which punitive considerations do not enter—fraud apart.

The allowance or assessment of damages, is of course no ground, in itself, for equitable interference, and can only be prayed or granted as incidental to some recognized exercise of equitable jurisdiction. Its recognition, as matter of even incidental relief in equity, has been slow and limited and under much question. 1 *Sedgwick on Damages, p.* 9, *and notes*; 2 *Story's Equity, secs.* 794 *to* 799*b, and notes.*

The fundamental rule of equity is to give compensation only and not vindictive, punitive or exemplary damages. 2 *Story's Equity, sec.* 795.

. This principle has been always announced as the true one, by this Court, in cases of specific performance. *Nelson vs. Hagerstown Bank,* 27 *Md.,* 51; *Powell vs. Young,* 45 *Md.,* 494; *Drummond vs. Green,* 35 *Md.,* 148.

And it is specifically applied to cases where a Court of equity is called to assess damages in the case of the wrongful taking and detention of property, the rule being that it will grant compensation only, and not damages in any vindictive or other aspect. *Sanders vs. Anderson,* 10 *Rich. Eq. (S. C.,)* 232.

In England, where the right of equity to grant compensation, by way of damages, incidentally to relief in certain cases, is now given by statute *(Sir Hugh Cairns' Act,* 21 *and* 22 *Vict., ch.* 27,) although the language of the statute is broad enough to cover damages of any sort, the Courts adhere to the doctrine which has just been stated. They have applied it in several mining cases analogous to the present, adopting always the distinction drawn at law by Baron PARKE, in *Wood vs. Moreland,* (3 *Queen's B.,* 440, *E. C. L., vol.* 43,) between cases where the wrong is done inadvertently, under a *bona fide* belief of title, and those where it is committed fraudulently and with knowledge. *Hatton vs. Wood, L. R.,* 4 *Equity,*

432; *Jegon vs. Vivian, L. R., 6 Ch. App.,* 742; *Livingstone vs. Rawyards Coal Co., L. Rep.,* 5 *Appeal Cases,* 25.

In the last cited case, the whole question is treated with great vigor and clearness by the Lord Chancellor and Lords HATHERLEY and BLACKBURN, and the opinion of the last named Judge, beginning on p. 31, is particularly referred to for its concise and admirable statement of the principles involved. And see 1 *Sedgwick on Damages,* 269, *and note*; 2 *Id.,* 498, *and note.*

The decree, therefore, which the Court below was asked, as a Court of equity, to enforce, was in substance a judgment on a verdict for punitive damages in tort. The Master Commissioner in his report bases his findings exclusively upon the fact that the defendant "was a trespasser, and as such unlawfully entered the plaintiff's land and mined and transported to market several hundred thousand tons of his coal." That it was competent for the Court below to look behind the decree and ascertain this, can hardly be disputed, after the decision of this Court in *Owens vs. Bowie,* 2 *Md.* 457.

A judgment, it was held, merges the cause of action, but does not preclude enquiry into its nature and character, where these are important to determine the propriety of proceedings taken under it. And see *Freeman on Judgments, sec.* 215; *Weber vs. Fickey,* 47 *Md.,* 200, 201.

Examining the record, the Court finds that the decree went beyond the equitable cause of action, and instead of compensating the appellant for the injury done to his property and the removal of his coal, gave him an enormous amount over and above compensation and over and above the value of his coal where the defendant found it. The injury actually done him was the limit of the compensation due him, and it seems impossible to hold that the stockholders of the corporation can be liable for the gratuity thus given him, in a suit to which they were not parties, and that a Court of equity in this State can be held bound

to enforce the decree which bestows it. Substantially it would amount to saying that stockholders, themselves innocent, are bound to make good, in equity, to the appellant, the expense which their own company innocently incurred and paid, and the appellant did not incur or pay at all, for mining his coal and placing it ready for transportation. In other words, the company, believing the appellant's coal to be its own, brought it to the surface, paying the expense of so doing, without which he could not have raised it himself. He is allowed its value, without any deduction of the expense, and now seeks to recover that from the stockholders, practically making them pay it twice—once through the corporation and now as individuals.

Such a result is so entirely at variance with all the doctrines and rules of equity, and so plainly opposed to the common sense of right, that it seems to place an impassable barrier at the very threshold of the appellant's case as a creditor. See *Cable vs. McCune*, 26 *Mo.*, 371; *Heacock vs. Sherman*, 14 *Wend.*, 58; *Bohn vs. Brown*, 33 *Mich.*, 257; *Archer vs. Rose*, 3 *Brews.*, 264.

*John M. Carter*, and *William Walsh*, for the appellee, James H. Bond.

The Court will observe that the claim of the appellant is based entirely upon acts of pure and naked trespass committed by the company upon his lands, and we are not aware of any principle of common law, or of equity, that would make the stockholders of a company liable for the trespasses committed by the corporation.

There was no statute in West Virginia creating a liability upon stockholders for debts of the corporation made *ex contractu*, and *a fortiori* none making them liable as *tort feasors*, for the trespasses of the corporation. Even in the States where a statutory liability has been imposed upon stockholders for the debts of the corporation, it is generally confined to obligations arising upon contracts

made with the company. *Heacock vs. Sherman*, 14 *Wendell*, 58; *Bohn vs. Brown*, 33 *Mich.*, 257; *Cabel vs. McCune*, 26 *Mo.*, 371; *Archer vs. Rose*, 3 *Brews.*, 264.

It would be very extraordinary legislation if any such could be found anywhere, that would compel a person because he held stock in a company, to pay damages that might be recovered for the trespasses of the company, though he might live in a State or locality distant from the scene of its operations, as the appellees in this case did, and have no direct participation in, or even knowledge of, the trespasses.

The corporation is a distinct person in law, and responsible for its own trespasses. Even the general agent or manager, or president, or director of a corporation, is not liable for its trespasses or wrongs, unless he authorized them, or directed them to be committed, although they were committed by subordinate agents of company appointed and controlled by him. *Stone vs. Cartwright,* 6 *Term, Rep.*, 411; *Hewit vs. Swift*, 3 *Allen*, 420; *Bath vs. Caton*, 37 *Mich.*, 190; *Batcheller vs. Pinkham*, 68 *Maine*, 253; *Weir vs. Barnet*, 3 *Excheq. Div.*, 32 and 238; *Story on Agency, sec.* 313.

The decree does not change the nature of the claim, nor bind the stockholder even as *prima facie* evidence of a debt in a case like this, where there is no statutory liability upon the stockholder, which, according to some authorities, would connect him with and bind him by the judgment. *Moss vs. McCullough*, 5 *Hill*, 131; *Miller vs. White*, 50 *N. Y.*, 137; *McMahon vs. Macey*, 51 *N. Y.*, 155; *Bartlett vs. Pentland*, 1 *Barn. & Adolph.*, 704; *Hard vs. Sibley*, 52 *Ga.*, 310.

" The individual liability of stockholders in a corporation is always a creature of statute. It does not exist at common law. The first thing to be determined in all such cases is, therefore, what liability has been created." *Terry*

Brant *vs.* Ehlen, *et al.*

*vs. Little,* 101 *U. S.,* 216; *Reid vs. Eaton Manfg. Co.,* 40 *Georgia,* 98.

This is a case of a non-resident complainant, suing the stockholders (resident in this State) of a foreign corporation created under the laws of West Virginia, for trespasses commited by that corporation upon his lands in West Virginia. The law of the domicile of the corporation would determine the validity of the claim. But there is no law in the State of West Virginia creating any such liability. And if there was such a law, it would have no force in this Court, except through the principle of comity, and such a law making innocent parties liable for trespasses, which they did not commit nor participate in, and which were not done in their name, or by their direction, or for their benefit, and from which they received no profits or advantages, would be so extraordinary, so contrary to natural justice and equity, and so highly penal in its character, that this Court would consider it outside of the principle of comity, and decline to enforce it. *Merrick vs. Van Santword,* 34 *N. Y.,* 208; *First Nat. Bank vs. Price,* 33 *Md.,* 487; *Derickson vs. Smith,* 27 *N. J. Law Rep.,* 166; *Halsey vs. McLean,* 12 *Allen,* 438; *Cabel vs. McCune,* 26 *Mo.,* 371; *Stockbridge Iron Co. vs. Cone Iron Works,* 102 *Mass.,* 80; *Woodward vs. Webb,* 65 *Penna. State,* 254; *Rice vs. The Hosiery Company,* 56 *N. H.,* 114; *Bird vs. Hayden,* 1 *Robertson, N. Y.,* 383.

*William A. Stewart,* for the appellees, John T. Grape, and John T. Grape and George Merryman, administrators of Samuel Maccubbin, deceased, and of Robert Hooper, administrator of Henry Lucas, deceased.

*Jno. T. McGlone,* for the appellees, King Bros.

*M. A. Mullin,* and *Bernard Carter,* for Fink Brothers & Co.

ROBINSON, J., delivered the opinion of the Court.

"The Virginia Coal and Iron Company of Hampshire County, West Virginia," was incorporated on the 16th of August, 1865, for the purpose of mining and shipping coal and other minerals, with a capital stock of $625,000, divided into 125,000 shares, of the value of $5 per share, 5000 shares of which were subscribed and paid for by the five incorporators.

At a meeting of the stockholders held on the 30th day of August, Ehlen, in behalf of himself and other incorporators, offered to sell to the company, a tract of coal land known as the "*Sinclair farm*" for $500,000, the purchase money to be paid as follows: $25,000 in cash, and the balance, $475,000, to be paid in the stock of the company. This proposition was accepted, and the shares of stock were issued accordingly, and delivered to the vendors in payment of the purchase money. In pursuance of the terms of purchase, the company took possession of the property, and began the mining and shipping of coal, and whilst thus in possession, suit was brought by the appellant in the United States Circuit Court, for the District of West Virginia, claiming title to an *undivided seven-eighths interest in said tract of land.* The decision in the Circuit Court was in favor of the company, but on appeal to the Supreme Court of the United States this decision was reversed, and the appellant's title to the land was established. Subsequently a decree was obtained by him against the company for the sum of $328,042.99, *with interest from June 1st,* 1877, *on account of the coal taken by* it from the land of the appellant. This suit is instituted to enforce the payment of this decree against the appellees as stockholders in said company. The bill alleges that the corporation *is insolvent,* and that at least *ninety per cent.* of the shares of stock *held by* the *appellees,* remains unpaid, and that *the unpaid instalments* constitute part of the assets of the company, and as such, subject to the payment of creditors.

These shares were issued by the company as *full-paid shares.* The certificates are in the ordinary form, of full-paid stock, with nothing on their face to indicate that they were not fully paid; and with the exception of *Ehlen,* they were purchased and held by the defendants as full-paid shares, with no notice of fraud or irregularity in their issue. In the view we take of the case, it is unnecessary to consider the many questions so elaborately argued at bar, for the liability of the defendants, after all, may be said to depend on the following questions:

*First.* Whether as *bona fide transferees* of *shares of stock issued by the company to the original subscribers as full-paid shares, and sold by them as such,* the defendants are liable in an action by a creditor of the company for unpaid instalments on said shares, if it should turn out, that they were not in fact full-paid shares?

*Secondly.* Whether the company, had the power under its charter to buy coal land for mining purposes, and to pay for the same in the stock of the company?

As to the first, were it a question of first impression, we do not see on what grounds the liability of the defendants as *bona fide* transferees could be maintained. The liability for subscription to the stock of a corporation is founded on contract. Where one agrees to take a certain number of shares, the law implies a promise to pay for them according to the terms of his subscription. If they are sold before all the instalments are paid, and are bought with such knowledge, the law implies a promise on the part of the purchaser to pay whatever may be due thereon, according to the terms of the original subscription. In such cases the purchaser stands in the shoes of the original subscriber. These are elementary principles, about which there can be no contention. But where shares are issued by the company to the subscriber as *full-paid shares,* and are sold by the subscriber as such, there is no ground on which a promise can be implied on the part of the pur-

·chaser *without notice,* to be answerable either to the com-
pany or to its creditors, should the representations on the
faith of which he purchased, prove to be false.   He could
not be held liable on the ground of contract, because he
never agreed to purchase any other·shares, than *full-paid
shares;* and if it be said that the shares were fraudulently
issued, he could not be held liable on the ground of fraud,
because he was in no sense a party to the fraud.   The
company beyond all question could not under such circum-
stances, maintain an action against him, because it would be
*estopped* · by its own acts and declarations.   But the argu-
ment is, that independent of the relation of debtor and
creditor between the stockholder and the company, grow-
ing out of the contract of subscription, there is another
·relation which the subscriber sustains to the creditors
.upon the insolvency of the company.   That as to them,
*the unpaid subscription* constitutes a *trust-fund,* which is
beyond the reach of any agreement between him and the
company to divest or impair.

In speaking of the assets of an insolvent corporation, as
constituting a *trust-fund* for the payment of creditors, it
is necessary to understand precisely what is meant by·the
·Courts.   No one will pretend for a moment, that in sub-
scribing to the stock of a company, the purpose is to
·create a trust-fund for creditors.   On the contrary, the ob-
ject primarily is to furnish means to carry on its business,
and to share the profits earned by the corporation; and so
long as it is a going concern, it has the right, and indeed
it is its duty to manage and dispose of its assets, includ-
ing stock subscriptions, for the promotion of its own inte-
rest.   If it ceases to do business, or if it becomes insolvent,
then all assets which it then has or owns, including *paid
and unpaid subscriptions, either in the hands of the origi-
nal subscriber, or in the hands of his assignee with notice,*
become a trust-fund, for the payment of creditors, and they
have the right to follow the property constituting this fund,

and subject it to the payment of their debts, unless it has passed into the hands of a *bona fide purchaser without notice.*

And further, if there has been any fraudulent or collusive disposition of the assets of the corporation, all who participate in the fraud may be held liable to the creditors. In *Panger vs. Upton, Assignee,* 91 U. S., 60, where this doctrine of *trust-fund* is as strongly asserted as in any other case, the Court say, " The capital stock of an incorporated company is a fund set apart for the payment of its debts. If diverted the creditors may follow it so far as it can be traced, and subject it to the payment of their claims, except as against holders who have taken it *bona fide* for a valuable consideration and without notice."

This is what the Courts mean in speaking of the assets of an insolvent corporation constituting a trust-fund for the payment of creditors, and as thus understood, it furnishes no ground on which the liability of the defendants as *bona fide* purchasers of stock, issued as full-paid, can be maintained, although such stock was not in fact full-paid. If this be so, on what other ground is the superior equity of the creditor based?

It was said, the purchaser ought to ascertain by inquiry, whether the stock issued by the company was in fact full-paid. It must be admitted, however, that this obligation rests with equal, if not greater, force on the creditor. He deals directly with the company, and has, it is fair to presume, greater means and facilities for ascertaining its real condition, and its claims to confidence and credit, than the purchaser of stock which is sold on the market, and sold too in most instances, at a distance from the company's place of business. Shares of stock are not, strictly speaking, negotiable instruments, but Courts speak of them as *quasi negotiable;* and when they are issued as full-paid shares, and as such sold in open market, the purchaser is not bound to suspect fraud where everything seems fair and comform-

able to the requirements of the law. Any other doctrine would virtually destroy the transferable nature of such shares, and paralyze the whole of the dealings in the stock of corporations. *Burkinshaw vs. Nicholls*, 26 *W. R. House of Lords*, 821.

Were this then a question to be decided on principle, we do not see on what grounds these defendants could be justly held liable to the creditors of the company. And such seems to be the whole current of decisions both in England and in this country. In *Nicholls' Case, Court of Appeals*, 26 *Weekly Rep.*, 334, shares were issued by the company as full-paid shares, when in fact there was no payment in money, nor any registration of the contract of subscription, as required by the Companies' Act of 1867, and upon the winding up of the company, some of these shares were held by Nicholls, trustee, as transferee without notice that such shares had not been paid in money. Suit was brought by the official liquidator against Nicholls for contribution, and the Court held that he was not liable. "When you have a receipt given you by the company, or a final receipt as a certificate of payment," said JESSEL, M. R., what more is a *bona fide* purchaser to ask for, and what occasion has he to make any further inquiry? "He has the representation of the company by the certificate, that the shares are fully paid up. It appears to me impossible that the company should be allowed to say the shares were not paid up in due course." On appeal the judgment in this case was affirmed by the House of Lords, and in speaking of the rights of the defendant as a *bona fide* purchaser without notice, Lord CAIRNS said:

"He receives a representation to the effect, that the law has been complied with, and, it would paralyze the whole trade in company's shares, if a person taking shares with a representation that they are fully paid up, must disregard this assertion, and satisfy himself of the fact by personal inquiry." And in *Bush's Case, L. R., Ch.*

*App.*, 555, where shares were allotted to Tucker, as full-paid shares, and by him transferred to the defendant as such, when in fact no money had been paid as required by the Companies' Act, the appeal was spoken of by Sir WM. M. JAMES, "as an idle and vexatious appeal." And in the still later case of *Waterhouse vs. Jamieson, Law Rep.*, 2 *Scotch and Divorce App.*, 38, Lord WESTBURY said,

"The appellant is a *bona fide* holder of shares, upon which, no doubt, there was a false statement made by the company, of which he had no knowledge, and as to which he was under no obligation to inquire, and therefore cannot be subjected to liability by having imputed to him knowledge of the falsehood."

Against the force of these decisions it is argued that the English Courts accord to creditors of insolvent corporations such rights only as the official liquidator can assert in the name of the corporation, and through its contracts; and that the ground on which a *bona fide* purchaser of stock issued as full-paid is held not to be liable, although such stock was not in fact full-paid, is that the liquidator is estopped from denying the representation made by the company, upon the faith of which others have been induced to purchase the stock. In this country, however, it is said the Courts accord to creditors rights growing out of the relation of stockholder, which upon the insolvency of the corporation attach at once to unpaid shares, whether in the hands of the subscriber or his assignee, and that the inquiry here is not whether the holder took the stock in good faith believing it to have been paid up, but whether the stock has in fact been fully paid.

This distinction is not, we think, supported by the decided cases. On the contrary, all the decisions in this country agree that the rights of the creditor to recover against the stockholder rests on the liability of the latter to the corporation, and that this liability is one founded on

contract.   Where shares of stock are issued to be paid in
certain instalments, the law implies a promise on the part
of the subscriber and his assignee, that they will pay
whatever may be due thereon according to the terms of
the subscription.   But where shares are issued as fully
paid, and these are sold in open market, and one buys them
in good faith on the representation of the company that
they are paid up, no promise can be implied on the part
of the purchaser to become liable if such shares have not
in fact been paid.   He is not bound to suspect fraud in
issuing the stock, and the remedy of the creditor in such
cases is against the parties to the fraud.   In *Foreman vs.
Bigelow,* 4 *Clifford,* 509, and *Steacy vs. Little Rock Rail-
road Company,* 5 *Dillon,* 348, the whole subject was con-
sidered and the English doctrine was fully approved.   In
the one, Justice CLIFFORD quotes with approval the opinions
delivered by JAMES, L. J., THESIGER, L. J., in *Nicholls'
Case,* and in the other, Justice DILLON relies on the opin-
ions of Lords CAIRNS, HATHERLEY, SELBORNE and BLACK-
BURN, delivered in the same case on appeal to the House
of Lords.   And in all the cases relied on by the appellant
as sustaining a contrary doctrine, it will be found either
that the certificates on their face showed that the shares of
stock were not in fact full-paid, or the facts and circum-
stances accompanying the transfer, were such as to put the
purchaser on the inquiry.   *Upton, Assignee,* 3 *Bissell,* 417;
*Upton, Assignee vs. Tribilcock,* 91 *U. S.,* 45; *Bowman's
Case,* 12 *Conn.,* 530; *Bend vs. Susquehanna Bridge Co.,* 6
*H. & J.,* 126; *Hall vs. U. S. Ins. Co.,* 5 *Gill,* 484; *Palmer
vs. Laurence,* 3 *Sandford Supr. Ct.,* 141.

The only remaining question to be considered is, whether
the company had the power under its charter to purchase
coal land for mining purposes, and to pay for the same in
the stock of the company?   And in dealing with this ques-
tion we must bear in mind that the company was incorpo-
rated for the purpose of mining and shipping coal, and that

under the laws of West Virginia it had the power to purchase and hold mineral lands to the extent of ten thousand acres. Now we take the law to be well settled, that a company may receive in payment of its shares of stock any property which it may lawfully purchase; and so long as the transaction stands unimpeached for fraud, Courts will treat as a payment that which the parties themselves have agreed shall be a payment, and this too in cases where the rights of creditors are involved. *Waterhouse vs. Jamieson, L. R.*, 2 *Scotch & Div. App.*, 29; *Ex parte Currie*, 32 *L. J., Ch.* 57; *Carling's Case*, 1 *Ch. Div.* 115; *Nicholls' Case*, 26 *W. R., House of Lords*, 821; *Foreman vs. Bigelow*, 4 *Clif.*, 508; 5 *Dillon*, 367. The right of the Virginia Coal and Iron Company to purchase coal land for mining purposes, and to pay for it out of the subscriptions to its capital stock is conceded. If so, what reason can there be in requiring that the money for the stock shall in fact be paid to the company, and at the same moment to hand it back to the vendor in payment of land? The passing of the money backwards and forwards would be an idle form, and so the Courts regard it. In *Spargo's Case*, 8 *L. R., Ch. App.*, 412, Sir WM. M. JAMES, L. J., said:

"If there was on the one side a *bona fide* debt payable in money at once for the purchase of property, and on the other side a *bona fide* liability to pay money at once in shares, so that if bank notes had been handed from one side of the table to the other in payment of calls, they might legitimately have been handed back in payment for the property, there is no necessity that the formality should be gone through of the money being handed over and taken back; but that if the two demands are set off against each other the shares have been paid for in cash."

Sir G. MELLISH, L. J.,—"It is a general rule of law that in every case where the transaction resolves itself into the payment of money by A. to B., and then handing it back again by B. to A., if the parties meet together and agree

to set the one demand against the other they need not go through the form and ceremony of handing the money backwards and forwards."

The bill in this case, does not seek to set aside the sale of the coal land to the company on the *ground of fraud*, and we must therefore deal with this question upon the assumption that the sale and purchase were made in good faith.

The company, it is true, agreed to pay $500,000 for the coal land purchased of Ehlen and others, but $475,000 of the purchase money was paid in the stock of the company, and the balance $25,000 was paid by the vendors themselves for the 5000 shares subscribed for by them. So, after all, the value of the stock received in payment of the land, depended on the value of the property purchased by the company.

It follows from what we have said that the stock thus issued to Ehlen and others, in payment of the land, must, in the absence of fraud or collusion, be treated as paid up stock, and as such the holders cannot be held personally liable to the appellant.

We find nothing in the Code of West Virginia under which the company was chartered, inconsistent with these views.

. The decree of the Court dismissing the bill, will therefore be affirmed.

*Decree affirmed, and*
*bill dismissed.*

(Decided 28th April, 1882.)