J. B. McPHERSON, District Judge.
This bill seeks to restrain the defendants from infringing two patents of the United States, Nos. 476,682 and 605,508, the legal title to which now belongs to the plaintiff. The facts are not disputed, and are accurately stated in the following extract from the plaintiff’s brief:
“Prior to June 14, 1899, the patents involved in the present litigation were the property of Joseph O. Henvis and the Pancoast Ventilator Company. At this time the Pancoast Ventilator Company was insolvent. A new company, known as the National Pancoast Ventilator Company, one of the defendants, was organized, and on June 14, 1899, Henvis and the Pancoast Ventilator Company assigned the patents to the National Pancoast Ventilator Company. As the old company was insolvent, the patents were liable for its debts, notwithstanding the assignment, and it was important for the interests of the National Pancoast Ventilator Company that the debts of the old company be paid. The plaintiff, Joseph A. Janney, Sr., was approached upon the subject of payment of these debts, and he agreed to advance the sum of $5,000 for that purpose. This he did, and the patents were assigned to *536 him on June' 15, 1899, as collateral security. On June 16, 1899, Joseph A. Janney, Sr., and the National Pancoast Ventilator Company entered into an agreement reciting the facts as above stated. In this agreement the plaintiff covenanted ‘that upon production of proper evidence to him that all of the debts of the Pancoast Ventilator Company have been paid, or their payment has been secured, and that the receiver of the Pancoast Ventilator Company has been discharged, and that the National Pancoast Ventilator Company has secured the sum of $5,000 as working capital for its business, he will reassign to the National Paneoast Ventilator Company the said patents hereinbefore particularly described.’ The agreement further provided that' the working capital should be raised by the sale of the treasury stock or otherwise within four months from the date of this agreement.
“The National Pancoast Ventilator Company complied with its covenant in so far as it concerned the payments of the debts of the Pancoast Ventilator Company and the discharge of the receiver of that company, but it never raised the sum of $5,000 working capital.
“On December 12, 1899, the plaintiff, in a letter addressed to the National Pancoast Ventilator Company, extended the time for raising the working capital for four months from December 15th. In this letter he said: T understand that this sum has not been raised, but that the company has been kept going by means of borrowed money. I do not wish to enforce the forfeiture clause of the agreement, but I must insist that steps be taken to raise the amount of working capital provided by the agreement’ In answer to this letter the National Pancoast Ventilator Company, by its president, wrote to the plaintiff on January 3, 1900, stating that plaintiff’s letter had been presented to the board of directors, and that the directors .had instructed the writer to advise plaintiff as follows:
“ ‘That you be thanked very much for extending the time limit relating to the working capital produced by sale of stock until April 15, 1900, and with the hope that by said time conditions may be as every one desires.’
“Notwithstanding the extension, the working capital was not procured, and on March 6, 1900, plaintiff again extended the time by a letter, which was as follows:
“ T hereby grant a further extension of time for the company to raise the working capital (as agreed, by the sale of treasury stock) for a period of six months from .the 15th day of April, 1900.’
“Notwithstanding the second extension, no working capital was ever raised.
“The defendants, in their answers, contend that the covenant of the Pan-coast Ventilator Company was complied with by the fact that between June 27, 1899, and May 4, 1900, Janney, Steinmetz & Co., who were stockholders in the company, sold and delivered to the company ventilators to the value of $3,066.19, and loaned money to the company to the amount of $1,-447.92, making a total of $4,514.11, and that between May 4 and October 5, 1900, the same firm sold and delivered ventilators to the company to the value of $887.50, and that on May 5, 1900, the company issued to Janney, Steinmetz & Co. 361 shares of preferred stock ‘in full settlement and satisfaction of said indebtedness of $4,514.11,’ and that thereafter it issued 71 shares of its preferred stock for the indebtedness of $887.50.
. “There is nothing in the pleadings or in the proofs to show 'that the firm of Janney, Steinmetz & Co. subscribed to the stock of the National Pan-coast Ventilator Company, referred to in the answers.
“The plaintiff testified that Joseph A. Janney, Jr., had stated to him that when the goods were sold and the money loaned to the company by its firm it was not intended that the goods and money should be put in as working capital, and that the issue of stock for the same was a mere afterthought. The plaintiff made a memorandum of this statement at the time, and Joseph A. Janney, Jr., did not deny that he made it, but simply stated that' he could not recall whether he had made it or not.
“The letters of December 12, 1899, January 3, 1900, and March 6, 1900, relating to the extension of time, were written during the very period that the goods Were being sold and the money loaned.” '
*537 The defendants do not deny the making and selling of the patented ventilator, but make defense on the ground that the National Pancoast Company fulfilled the- agreement of June 16, 1899, and raised the working capital referred to therein by the transactions above described with the firm of Janney, Steinmetz & Co.; thus becoming the equitable owner of the patents, and acquiring the right to compel the transfer of the legal title. In support of this defense several cases were referred to (Sparge’s Case, L. R. 8 Chan. App. 407; Veeder v. Mudgett, 95 N. Y. 295; Brant v. Ehlen, 59 Md. 1) in which it has been held that, although a statute may require subscriptions to the capital stock of a corporation to be paid in cash, nevertheless such requirement is obeyed by the bona fide transfer of property to the corporation at an agreed valuation. It does not seem to me to be necessary, however, to consider the doctrine of these cases, because the language used here is different and will not fairly bear the construction now contended for, and because the parties have themselves declared its meaning by their subsequent conduct. The ordinary meaning' of “working capital” is certainly “cash,” money that is instantly available for any corporate need, and not raw material or finished articles, which may not be available at all when the credit and life of the enterprise may be at stake. When “the sum of $5,000” is added to the other phrase, the conclusion can hardly be resisted that money, and money alone, was in the minds of the contracting parties when the agreement was signed. That it continued to be in their minds seems clear to me from the letters of December 12, 1899, and January 3 and March 6, 1900:
“December 12th, 1899.
“National Pancoast Ventilator Company: Gentlemen: Under the agreement of June 16, 1899, your company agreed to raise the sum of five thousand dollars as working capital. I understand that this sum has not been raised, but that the company has been kept going by the means of borrowed money. I do not wish to enforce the forfeiture clause of the agreement, but I must insist that steps be taken to raise the amount of working capital provided by the agreement. I am willing to accept a new agreement extending the time for raising this capital to four months from December 15th. Yours truly, Jos. A. Janney.”'
“January 3rd, 1900.
“Mr. Jos. A. Janney, My Dear Sir: Your letter of December 12th, relative to the agreement concerning patents of ‘Pancoast’ Ventilator, was duly presented at the board meeting of this company, held Tuesday, January 2, 1900, and they instructed me to advise you of action taken upon this letter as follows:
“ ‘That you be thanked very much for extending the time limit relating to the working capital produced by sale of stock until April 15, 1900, and with the hope that by said time, conditions may be as everyone desires.’
“With kind regards, yours very truly,
“National Pancoast Ventilator Co."
“March 6th, 1900.
“National Pancoast Ventilator Co., Gentlemen: I hereby grant a further extension of time for the company to raise working capital (as agreed, by the sale of treasury stock) for a period of six months from the fifteenth day of April, 1900.
“Yours respectfully, Jos. A. Janney.”
*538 It will be observed that when Mr. Janney, on December 12th, insisted that steps should be taken to “raise the amount of working capital,” by which he undoubtedly meant the “raising” of money and not the acquiring of material, the National Pancoast Company not only did not object to this construction of the agreement, but declared that their own view was the same as his; for they thanked him for extending the limit, and declared that the capital was to be produced “by sale of' stock.” This construction was again, and unmistakably, put upon the agreement by Mr. Janney’s letter of March 6; but to this also the defendants never objected, although at that time a large part of the transactions with Janney, Steinmetz & Co. had been completed. Surely, if the defendants then supposed that they had already “raised” about $4,000 by accepting manufactured ventilators from Janney, Steinmetz & Co., and by borrowing money from the firm, they would have been prompt to deny the correctness of the opposite construction. It seems clear to me that the issue of stock to Janney, Steinmetz & Co. was a mere afterthought; and in coming to this conclusion I have not been influenced at all by the alleged' declarations of Joseph A. Janney, Jr., which, for the purposes of this case, I have treated as incompetent testimony.
The plaintiff is entitled to the usual decree for an injunction and an account.